Today, the District Court erred as to the construction of two significant claim terms. In each instance, the District Court read language into the terms that not only is not Let me ask you a question. In the Joint Appendix at 1021, you distinguish the PSI, the patent directed to Abraxane, on the basis that it discloses controlled-release polymer-encapsulated formulations. But in the red brief, Celgene says, Accusphere is attempting to read its claims on Celgene's X-Brain product, a product that consists of the same albumin polymer-encapsulated formulations that you disclosed during prosecution. Why should we not find that you disclaimed? Well, first of all, the first part of what Your Honor was referring to is a non-infringement argument, and we're not at that point. This is on the of-attacks end point, Your Honor, and there was no disclaimer because the ultimate reason that the examiner allowed the claims and the basis, the argument that we made to the examiner, was on the speed of the dissolution. Now, controlled-release and coding of particles may, in some instances, have some impact on that. I concede that. But that doesn't mean that in every instance that the albumin-coded particles or that a coded particle is going to have an impact on the release rate, the dissolution release rate. I mean, I suppose we could quibble about to what extent the examiner relied on this particular distinction, but nevertheless, it is true that you, your client, made these statements in the prosecution history, and I think the law is that any statements you make in the prosecution history as to what is the best understanding of the claim counts and should be understood in terms of trying to find the best understanding of the claim. Well, Your Honor, I would say that there are various types of statements that are made in the prosecution history, and one of the lessons of the law with respect to the prosecution history is that there's give-and-take and back-and-forth between the applicant and the examiner, and so it is difficult at times to discern a precise and a clear and unambiguous disclaimer. And in this case, there is no clear and unambiguous disclaimer of the controlled release or the coded particles, because in this case, the way the applicant went about his amendments in this case was to have a paragraph that would describe the prior art and then would have a paragraph that would distinguish it. The statements that Your Honor is referring to come from the description paragraph, and a description is not the same thing as a disclaimer. It is the next paragraph where the distinction is actually being made, and in that paragraph where the distinction is being made, the distinction is based on dissolution rate and not specifically on the points that Your Honor has referred to from that statement. So when, I guess it's at JA 1021, the applicant says, Haines, and then says, There are no nanoparticles, nor is there a matrix formed of a hydrophilic excipient that dissolves upon contact with water to release nanoparticles and microparticles of a taxane. To me, the context is clear that the applicant is setting up a strong distinction between how it understands Haines and likewise how it understands what it's doing with its amendment. And I understand, I believe what Your Honor is pointing out. If you go a paragraph down at the same place in the appendix, 1021, there's a paragraph that begins with the word accordingly. And in that paragraph, the applicant makes very clear that no distinction is being made based on the size of the particles in Haines and Desai as opposed to the invention. It specifically concedes that those references cover particles that are less than five microns in size. And so what the distinction was being made on with the patent office at that point in time was not size. Are we flipping over to particle size now? I'm sorry. I heard Your Honor. I thought that's where you were going with that. I'm sorry. Judge Wallach led off right into taxane only, so I meant to try to stay there. And I understood this portion of the prosecution history where the applicant was distinguishing its claim from Haines and Desai. And as I read this excerpt on JA 1021, it really looks like the point to be made here is that you release taxane from the matrix. So whatever is in that matrix, the remainder of the matrix dissolves and goes away, leaving you taxane, resulting in taxane. And Haines and Desai, nevertheless, doesn't work that way. That's what I get from this portion. Well, what it says, again, and again, I'll try to address Your Honor's question more specifically this time. In that same paragraph I referred to, the applicant- Wait a minute. Which one? The accordingly or the- The accordingly paragraph. Okay. At JA 1021, farther down the paragraph, they say the distinction is that there is no immediate release upon dissolution of the surrounding matrix that is taught in the Desai and Haines references. And the patent examiner goes on to say, in fact, in the notice of allowance, when the patent examiner allows the patent, it's on the basis of the different dissolution rate. It's not on the basis of the size or on the basis of purity of particles. It's on the basis of the dissolution rate. And that's what the invention was. That's what they were telling, what the applicant was telling the examiner the invention was during that period of time. So the very end of 1021, I guess it says, not a formulation having dispersed therein nanoparticles and microparticles of a drug released immediately upon dissolution of the surrounding matrix. Again, doesn't that reinforce the idea that these particles and these particles alone of taxane get freed up? There's no question that the particles of taxane leave the matrix and get freed up. There is an issue between the parties about whether it is only the taxane particles that get freed up, which, Your Honor, I'm sure is aware of. But I'll pass that for right now. There's no question that that is the heart of the invention and that makes for dissolution rates to happen quicker. But the question I think Your Honor is asking me is, did the applicant here give up in the course of making that statement, the idea that taxane could be something more than the pure taxane that the district court required in its construction? And there is nothing like that that is given up in this statement. The claim was defined as being essentially pure taxane, formed of only taxane, essentially a pure taxane. There's nothing in the paragraph we've been looking at that says that it has to be, that our invention is only a pure taxane, and that that's what distinguishes it from the prior art. But it sure seems to say that the other stuff goes away. Well, it says that— And that's how it distinguishes. It distinguishes it by saying that there's a matrix, and based on the use of that matrix, you get a faster dissolution rate. It doesn't. It never says that everything goes away other than the taxane. And, in fact, that's contrary to what the specification of the patent actually says. The specification of the patent says that you can have insoluble components that will be mixed in with the taxane. So those, by definition, wouldn't go away when you expose them to the aqueous medium. So that would be contrary to the way the invention is defined in the specification itself. There is nothing about purity of taxane, or taxane being the only thing present. But I guess we can all agree that both Haynes and Desai have some kind of encapsulation of the taxane, right? That there's a surfactant or something that's surrounding the taxane particles, thereby leading to some kind of controlled release formulation. Yes. And now the applicant's goal here is to get away from Haynes and Desai and distinguish over it the best way it thought it could. And the way that they ultimately did that— And so you're now saying whatever they gave up, they didn't give up a version of taxane that still could be encapsulated by something, but still somehow, nevertheless, be a faster dissolution than the controlled dissolution of Haynes and Desai? Yes. And, in fact, that's— But do you understand why you're asking me to read something extra into the actual text of the prosecution history? Well, I don't believe so, Your Honor, because what it says is it describes Haynes and Desai. I think Desai in particular is what Your Honor is referring to. Desai with controlled release—I've now lost the word, but I believe it says encapsulated particles. And then it goes on to say that the key fact is that it leads to dissolution, faster dissolution in our product. The use of the matrix leads to faster dissolution. And, in fact, in the specification of the patent, it actually contemplates the use of particles that are coded. Pegylated excipients are specifically disclosed in the patent specification. How do we know what pegylated excipients mean? Because as I understand it, that wasn't something that was debated, evaluated, the experts did any treatment on below. Is that fair to say? It was not discussed below. It's not a waiver because it's not a different issue. It still goes to the same issue that we're talking about here, which is the property— I understand, but I don't know what pegylated excipient means. And, Your Honor— It seems like you think you know what pegylated excipient means, but it's just you, unfortunately. Well, but I point to the specification, Your Honor, at column 5, lines 52 to 62, where it's discussed. And it says pegylated excipients are excipients that envelop the taxing. And so that, by its nature, means that you're talking about something other than just a pure taxing. You're talking about something that envelops the taxing. So the fact that there is some kind of coded particle is not the basis for the distinction here. The ultimate basis for the distinction is how fast it dissolves. And it's made very clear, I think, in the prosecution history as well as in the patent, that what makes this a faster-dissolving situation is the use of the matrix and the matrix that parts of which dissolve. Mr. Lombardi, you're well within your rebuttal time. Do you want to devote any of your remaining three minutes to your tiny problem? To my— Your nano versus micro. Your Honor, I'll just say—I will just say that I think that the term is defined right there in the claims. The nanoparticles and microparticles are set forth as being in a certain range. You say—your argument is there's no universally accepted definition. And that's what the court found as well. That's right. And I say that. But the judge did say that there was a definition. It's not just one that was universally accepted. Yeah, he found a definition, but he made that definition based on an unfortunate misunderstanding of the record. He thought that the inventor had written a particular chapter of a book that defined the term. That ends up being not true. And I will reserve the remainder of my time. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. There's much to say about the language of the claims here. We've said it in our brief. The—I'll start with the nanoparticles issue and then turn to the—of a taxing issue. If you look at the claim language here, the nanoparticles and microparticles language shows up in the first clause as one or as two of the four components of the matrix. It then shows up again— With an and. I'm sorry? With an and as two different things. Yes, and as two different things. And Judge Wallach, you started this argument with the place that we could end this argument, and that is at page 81021 of the record. If you look in that first paragraph where the applicant is talking about Hanes, they tell the world that Hanes is formed into microparticles by spray drying, period. There are no nanoparticles. What the applicant is telling the world here is that there are two different things. There is something called a microparticle and there is something called a nanoparticle. That cannot be reconciled with the position being brought here today by my friend on the other side, and that is that they all mean something that's moshed together. It just means particles. And if you take my friend's construction and apply it to the claim, what you really have would be a claim that says particles of a taxane having these particular measurements. That's not what the claim says. Where in clauses are you supposed to bring further definition? They don't substitute for a separate clause. I guess one of their arguments, though, is that the specification appears to use the term microparticles interchangeably with the term nanoparticles and microparticles to a point where what they're really talking about, what the patent is really focused on, is that the mean diameter has to be somewhere between 10 nanometers and 5 micrometers. So we're just talking about really small particles that have this particular mean diameter range. There's no question that that is the limitation of the claims, but it's not the only limitation of the claims. If we're talking about what my friend has referred to in his briefs as the lexicography argument, let's again step back and keep in mind that this court's precedent says that lexicography has to be what? It has to be clear. It has to be unmistakable. It has to be unequivocal. What you see in the specification is anything from that. For one, they did define terms in the specification. They defined two terms in particular, spray dry and patient, and they did that in an ordinary definitional mode. They said, as used here is. This is at the top of column 8 in A41 and the bottom of that same column on page 841. They didn't do that with nanoparticles and microparticles. In fact, the specifications in the claim language are somewhat inconsistent because there's a place in the specification where they look to for their so-called definition that refers only to microparticles and makes not mention at all of nanoparticles. I guess they use that and rely on that to suggest that the terms microparticles and nanoparticles and microparticles are essentially the same thing. I think thematically that's what they're targeting throughout. What they're doing is they're relying on the fact that their claim drafting and patent drafting left ambiguities and had some, as the district court mentioned, some inexplicable sloppiness in terms of when they added nanoparticles to the claims, they inserted nanoparticles in some places but not in others where it would have made sense. Certainly in the specification, that's not the way the claim was originally worded. The claim does not include a nanoparticle limitation, but they had to add it in order to make the argument that they did at page 821 to get over Haynes. With regard to a couple of other comments about lexicography, if you apply a lexicography here, it would collapse and make redundant those limitations, as I said before. And there's another thing that's unclear about their lexicography. They take the wherein clause, which has both a mean diameter limitation and a total surface area limitation, and they decide, well, we're going to take half that. We're going to cherry pick that first half and say, well, that's our definition. But it doesn't take into account at all the surface area part of it. And that's not the sort of clarity and definitiveness that for an implied definition like Bell Atlantic you'd have. What are we supposed to make of dependent claim 6? Is it your view that dependent claim 6 is invalid? Well, we haven't asserted an invalidity defense in this appeal with regard to dependent claim 6. Right, but just following through on the logic of your position, what does that do to claim 6? Well, I think claim 6 has some indefiniteness problems. I have no doubts about that. One of the problems with it, of course, is that it doesn't use the nanoparticles and microparticles when you would expect it in ordinary usage to have nanoparticles in there. The other is, of course, this indefiniteness problem that we come to with regard to our cross-appeal having to do with the whole question of what would mean diameter and how do you measure it? In any event, the claim 6 argument isn't really a pure claim differentiation argument. Most of their argument is that there might be some undercoverage at the lower level from 0.50 microns to 1 micron. But in point of fact, depending on how you measure and which measurement method you use for mean diameter, even a volume mean diameter isn't just an arithmetic mean. It's an estimation that takes place with a machine that may be analyzing using optical scanning and using calculations that are well beyond my modest level of skill in this art. But the fact of the matter is that this is a desperate effort to say, well, mean here just means average, and you can just figure out that that's inconsistent with that. And when this court tolerates overlap like that, it sometimes even tolerates complete overlap in claim differentiation if the language allows for that, and that's what the language here does. With regard to the of a taxing limitation, if I could turn to that, the language is in the claim, again, it's of a taxing. Just as Wallach said earlier in the colloquy with my friend, the language of the claims says there's a matrix that includes nanoparticles and microparticles, and the whole point of the invention is to make the nanoparticles and microparticles separate away from the matrix. It's of a taxing. It doesn't say, and this is important, substantially of a taxing. It doesn't say mostly of a taxing. It doesn't say a majority taxing. It says of a taxing. But I think the claim language itself is still open to the word comprising. So I don't necessarily see in just the claim language by itself in isolation. The preclusion of the taxing also being attached to something else is so long as the hydrophilic excipient and the wetting agent have been now separated and dissolved. It's certainly true that it is a pharmaceutical composition comprising, but it is comprising a matrix. And then the matrix is comprising these four distinct elements. And one of them is of a taxing. It is nanoparticles of a taxing and microparticles of a taxing. Now, being an open claim doesn't mean that you can add something else to that taxing and still have it be of a taxing. If it were an open claim, as the district court used the term unzipped, which I thought was a pretty interesting and useful way of thinking about how comprising might work in this claim. Does it unzip of a taxing so that the microparticles and nanoparticles can be made of something else entirely in addition to taxing? No. What the comprising claim does, even assuming that it's unzipped all the way down there, is it allows you to add a fourth element, a fourth limitation. So maybe the matrix is open, that it has to have these four things, the hydrophilic excipient, the wetting agent, nanoparticles, and microparticles. But it might also have some other excipient. It's like a pegylated excipient? Like the pegylated excipient that we were never able to develop the arguments on in the trial court. What's your understanding of the pegylated excipient that surrounds the taxing particles? Well, it's hard to square with this patent, honestly, if it is indeed surrounding the taxing particles. Not necessarily. You could still potentially get a faster dissolution rate, so long as the taxing particles are surrounded by something called a pegylated excipient that permits a faster dissolution rate. In theory, you could get a faster dissolution rate. However, here's what the language of the claim says. It says, beneficially envelops or shields the paclitaxel from macrophage uptake. Now, as I understand it, a macrophage is a white blood cell that eats cellular debris. And this is to keep those white cells, in some fashion or another, from eating the cellular debris. Here's the problem with that, and it actually feeds Judge Chen right into our indefiniteness argument with regard to this dissertation. Our friends, in their briefs, both in their opening brief at page 7 and their reply brief at page 52 and 53, show you this schematic that shows this biphasic dissolution. Well, in the second beaker, which is filled with a lot more liquids, I guess that's supposed to indicate what the drug is like when it's in the body after it's been injected into an IV solution, an IV bag, say. That second solution shows the paclitaxel in solution. So it's hard to see, if there's a biphasic solution, how, in the body, this could guard those now in solution nanoparticles, microparticles, whatever form they're in at that point once they're now in solution. And, of course, the problem, and let me just turn to indefiniteness to try to help answer this question. The basic indefiniteness problem we have with this is that let's assume, for sake of argument, that my friend is right. The claim can be read to require the biphasic dissolution where the matrix dissolves first, and then there's a second dissolution where the nanoparticles and microparticles go into solution. That's all well and good, except that example 3 of the patent doesn't tell you that it points in exactly the opposite direction. Example 3 is describing a monophasic solution, a monophasic dissolution, excuse me, and even their own Dr. Langer said that's what happens. It measures, example 3 is the test, and it measures when the taxate goes into solution, and that's at page 831.73 to 831.75 of the record. So, what you've got is, at best, giving my friend's claim construction argument the benefit of the doubt. He says it's claiming a biphasic dissolution. You've got example 3 that says it's claiming a monophasic solution. Which do we rely on? We don't know. We can't tell. That's indefinite, particularly after Nautilus. You're in your cross-appeal time, but... I'm trying to make sure that I lay the groundwork for any rebuttal that I need to do with regard to the cross-appeal. Let me just make one other comment about the cross-appeal with regard to the mean diameter limitation, Judge Pollack. Here's what we can all agree on. Everyone agrees that there are lots of different kinds of mean diameter, and everyone agrees that the patent doesn't say which one of these kinds of mean diameter you use. What the district court did, though, is say that, well, the discussion of Haines that took place in the prosecution history says, well, that tells me it should be volume mean diameter or mass mean diameter, which means the same thing. Now, that can't be squared with 37 CFR 157 1.57 D2, which requires essential material for establishing the definiteness of a patent claim to be incorporated by reference. There is no argument and no possible argument that Haines was incorporated by reference. In fact, it would be strange indeed for them to have incorporated by reference a reference they were trying to distinguish around. I've left a minute and a half, and I'll return. Thank you. Your Honor, as to the above-attached point, I would like to refer the court to the next amendment, the next communication between the examiner and the applicants at A1046, which I think illustrates precisely where this was going. You'll see at that page, it's under, first there's a heading, Haines, in the middle of the page. There is a description of Haines. Haines discloses large diameter, i.e., greater than five micron aerosolizable particles, right? Yes, and that's the paragraph that describes it, Your Honor. And then below is where the distinction is made. The combination of Desai and Haines would not leave one skilled in the art. And if you go, I won't read every word of that, Your Honor, but each of those points that are made for the distinction is based on dissolution, and based on dissolution speed. It is clearly not based on size, and it's not based on whether there might be some coating there, which, as Your Honor pointed out, could be a coating that has no effect on the dissolution rate. So this is the way the file history goes about it. With respect to whether this is biphasic or multiphasic, Example 3 makes very clear that this is a biphasic system. It talks about a 10 milliliter concentration that the matrix is put in first, then the next is put into a 250 milliliter concentration of aqueous medium. That's two phases. That's exactly what we have said throughout. As to the argument, my colleague said, I believe that there was an argument made to get over Haines based on its size, and I think Your Honor might have been alluding to that when you pointed to the first line at A1046. Actually, there is no distinction based on size. In A1021, the applicant specifically references the fact that there can be no distinction based on the size of the particles. A1021 recognizes that the prior arts teaches that the drug formulation had a total particle size of less than 5 microns. That's what was claimed in the invention. So no distinction was being made that way, and the examiner didn't understand that way. Brief ways to indefiniteness, Your Honor. Time's up. Time's up. Then I'll be very brief on indefiniteness, Your Honor. Thank you. I expect to clarify, as my partner pointed out to me, that when I referred to in my discussion with Judge Chen the test, I should have made clear that it was the test for determining whether the microparticles and nanoparticles had dissolved. That's what's in Example 3. Other than that, I have nothing further. Thank you. Thank you, counsel. The matter will stand submitted.